UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JOSEPH CUNNINGHAM, Individually, on behalf of a class of others similarly situated,

        Plaintiff,

    v.

MULTNOMAH COUNTY and DAN STATON, both individually and in his official capacity as Sheriff,

        Defendants.

Case No. 3:12-cv-01718 -ST

FINDINGS AND RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Joseph Cunningham ("Cunningham"), was an inmate at Multnomah County Inverness Jail ("MCIJ") for a few months in 2010. He filed this action on September 23, 2012, against Multnomah County and its Sheriff, Dan Staton, alleging violations of the Fourth and Eighth Amendments to the United States Constitution for searches conducted on inmates at MCIJ following participation in kitchen duty. Cunningham seeks compensatory damages on both an individual and classwide basis, as well as punitive damages against Sheriff Staton. He also seeks a judgment declaring unconstitutional Multnomah County's policy and practice of

1 – FINDINGS AND RECOMMENDATION

strip searching kitchen workers without an individualized suspicion, and a preliminary and permanent injunction enjoining Multnomah County and Sheriff Staton from continuing to implement the strip search policies and practices.

Pursuant to FRCP 23(a) and (b), Cunningham has filed a Motion for Class Certification (docket #24) to certify a class and three subclasses. Following a hearing on the motion, the parties submitted supplemental materials concerning the proposed class definition. Defendants oppose class certification, challenging both Cunningham's standing and – in whole or in part – each one of the showings required by FRCP 23(a) and (b). For the reasons that follow, the Motion for Class Certification should be granted as to Subclasses 1 and 2, and conditionally certified as to Subclass 3, as listed in Plaintiff's Supplemental Proposed Class Definition (docket #37).

## <u>ALLEGATIONS</u>

### I. <u>Named Plaintiff</u>

Cunningham was booked into Multnomah County custody in mid-August 2010 and transferred to MCIJ on August 14, 2010. Griffin Decl. (docket #31), Ex. 1. For the duration of his stay at MCIJ between August and October 2010, Cunningham was classified as an "unsentenced" inmate. *Id*, ¶ 4. The "unsentenced" classification is given to those inmates who are arraigned but pending trial or entering a plea on charges. Adgers Decl.(docket #29), ¶ 7. "Unsentenced" inmates also include those who have been sentenced to confinement in the custody of the Oregon State Department of Correction ("ODOC") but have not yet been transferred to ODOC. Adgers Supp. Decl. (docket #35), ¶ 4. "Sentenced" inmates are those who are convicted of a charge and sentenced to incarceration in a county corrections facility. Adgers

2 – FINDINGS AND RECOMMENDATION

Decl., ¶ 7; Adgers Supp. Decl., ¶ 4.  Those inmates who have both sentences of incarceration and

pending charges are treated as "sentenced" inmates.  Adgers Decl., ¶ 7.

Cunningham worked as a dorm worker September 1-10, 2010.  Adgers Supp. Decl., ¶¶ 6-

7 & Ex. 2.  His status then changed to a utility worker, and he began working in the MCIJ

kitchen on September 12, 2010.[1]  *Id*, ¶¶ 7-9 & Exs. 2-3.  He worked there until October 3, 2010.[2]

*Id*.  On October 6, 2010, Cunningham was released from MCIJ in order to be transferred to

ODOC's Coffee Creek Correctional Facility on November 19, 2010.  *Id*, ¶ 7 & Ex. 2; Griffen

Decl., ¶ 3 & Ex. 1.

## II.    <u>Strip Searches During Cunningham's Incarceration at MCIJ</u>

On October 15, 2001, nearly nine years before Cunningham's arrival at MCIJ, the

Eastside Facilities Commander issued MCIJ Special Order 01-21 stating that "Kitchen Work

Crews, garbage/linen Work Crews, and any other crew assigned to work outside of the Facility,

shall be strip searched before returning to their Housing Unit."  Farrar Decl. (docket #25), Ex. 2,

p. 1.

Cunningham alleges that during his incarceration at MCIJ, starting no later than

September 23, 2010,[3] and continuing until October 3, 2010, he worked five days a week from

4:30 a.m. until noon, in the MCIJ kitchen.  Complaint, ¶ 31.  During that time, deputies strip

searched him and others in a group and public setting at the close of each shift.  *Id*.  These

---

[1] Cunningham recalls that he began work in the MCIJ kitchen on September 11, 2010.  Cunningham Depo. (Farrar Decl., Ex. 3), p. 64.  However, as reflected by defendants' records, that date is actually September 12, 2010.

[2] Cunningham worked the last two days in the MCIJ kitchen on October 2 and 3, 2010, after being sentenced on October 1, 2010, to 13 months in state custody.  Adgers Supp. Decl., ¶ 11 & Ex. 3; Cunningham Supp. Decl. (docket #37), ¶ 5.

[3] Because Cunningham filed his Complaint on September 23, 2010, his allegations relate to searches during the prior two years in order capture those claims within the two-year statute of limitations although he endured strip searches before that date.  *Sain v. City of Bend*, 309 F3d 1134, 1139 (9th Cir 2002).

3 – FINDINGS AND RECOMMENDATION

searches took place in the MCIJ "boot room" in view of other inmates and monitored by an operational closed circuit camera with numerous deputies in attendance. Mathews Decl. (docket #30), ¶ 8. The search included removal of all clothing, including underwear. Complaint, ¶ 32. Deputies visually inspected each naked inmate, then instructed each inmate to bend over and spread his buttocks, and lift and separate the penis and testicles for visual inspection.[4] *Id*, ¶ 33; *see also* Cunningham Depo, pp. 66-67. Three shifts of ten workers each worked daily, including ten women who did clean up in the afternoons, for a total of 30 strip searches daily. Complaint, ¶ 31.

Cunningham worked in the MCIJ kitchen about 20 times and was strip searched in a group each time he came off shift. Cunningham Depo., p. 66. Inmates were not touched during these searches and the entirety of the search took fewer than five minutes. Mathews Decl., ¶ 8; Cunningham Depo pp. 23, 68. Cunningham acknowledges that he suffered no physical injury as a result of any of these strip searches. Cunningham Depo, p. 23.

### III. Cunningham's Lawsuit, Installation of Privacy Panels, and Policy Change

After his release from MCIJ on October 6, Cunningham was housed at the Multnomah County Detention Center until November 19, 2010. Griffin Decl., Ex. 1. On November 16, 2010, while in custody, Cunningham served a Notice of Tort Claim on Multnomah County, listing a "Date of Loss" of September 11 through October 3, 2010 and describing the circumstances as follows:

> While working as a kitchen worker at [MCIJ], I . . . was subjected to group strip searches in plain view of other inmates. As I was an unsentenced inmate, the Multnomah County Sheriffs Department clearly violated my 8th Amendment rights because they failed to

---

[4] Cunningham alleges that female inmates were instructed to lift their breasts. Complaint, ¶ 33. Defendants assert that strip searches of male inmates were conducted only by male deputies. Mathews Decl., ¶ 8.

> comply with the American Bar Associations Standards for
> Criminal Justice, Specifically Standard 23-6.10(f).

Cunningham Depo. Ex. 2.

Sometime in 2011, MCIJ command staff ordered installation of privacy panels in the MCIJ boot room for use during strip searches. Mathews Decl., ¶ 11. The panels create a series of booths which allow deputies outside of the booths to see the inmates standing in each booth, but do not allow an inmate in a booth to see the inmate in the next booth. *See id*, Ex. 2. The panels were installed over a two-day period and were fully in place by September 16, 2011. *Id*, ¶ 11.

About two months later, on November 8, 2011, a little over a year after Cunningham was released from MCIJ and filed his tort claim notice, MCIJ Facility Commander Captain Linda Yankee issued Special Order 11-44 concerning Routine Strip Searches at MCIJ which states that:

> This Special Order complies with Corrections Division Special Order 03-25, CD07.109.000 and is in conjunction with MCIJ Special Orders 01-21, 07-09 and 11-01.
>
> I.    For the purpose of strip searches, privacy stalls have been put in place in Processing and in the kitchen dress-in room.
>
> II.   Whenever conducting a strip search, Corrections Staff shall use the stalls to ensure privacy for the inmate.
>
> III.  Corrections Staff shall ensure that when an inmate is unclothed they are not in a position to be viewed by other inmates.
>
> IV.   Corrections Staff shall ensure that hand sanitizer is available to inmates before they undress.

*Id*, Ex. 6.

Cunningham is no longer under supervision by Multnomah County and, at the time he filed this action, was no longer in custody. Complaint, ¶ 3.

5 – FINDINGS AND RECOMMENDATION

**IV. Class Claims**

The Complaint alleges that defendants' blanket strip search policy pertaining to inmates who are coming off kitchen duty violates inmates' Fourth and Eighth Amendment rights and seeks: (1) compensatory damages for each class member (First Claim, ¶¶ 35-44 & Prayer, ¶ B); (2) punitive damages of $1 million against Sheriff Staton (Complaint, ¶¶ 53-54 & Prayer, ¶ C); (3) a declaratory judgment that the strip search policy and practice is unconstitutional and improper (Second Claim, ¶¶ 45-47 & Prayer, ¶ D); and (4) an injunction enjoining defendants from continuing to strip and visual cavity search kitchen workers absent particularized, reasonable suspicion that the arrestee subject to the search is concealing weapons or other contraband (Third Claim, ¶¶ 48-52 & Prayer, ¶ E).

## FINDINGS

Cunningham seeks certification of a class for claims arising under Fourth and Eighth Amendments to the United States Constitution. Specifically, he seeks to represent a class of inmates identified as follows:[5]

> All persons placed into custody of the Multnomah County Inverness Jail subjected to unclothed searches at the conclusion of kitchen duty shift in the "boot room," between the dates of September 23, 2010,[6] and until the date on which Multnomah County and Sheriff Dan Staton cease conducting the strip searches, including:
>
> **(Subclass 1 – "No Privacy Panel Group Strip Search Damages Subclass")** those persons who were subjected to group unclothed searches between September 23, 2010 and November 8, 2011[7];

---

[5] Cunningham submitted this revised class definition following the hearing on the pending motion to replace the definition originally proposed in the Motion for Class Certification and Memorandum in Support Thereof (docket #24).

[6] This date corresponds to the two-year statute of limitations.

[7] This date corresponds to the date Captain Yankee issued Special Order 11-44. Farrar Decl., Ex. 6. However, defendants have submitted evidence that, a few weeks earlier, on September 15 and 16, 2011, MCIJ installed

(**Subclass 2 – "Suspicionless Strip Search Damages Subclass"**)
those persons who were subjected to unclothed searches between
September 23, 2010 and to and until the date on which Multnomah
County and Sheriff Dan Staton cease conducting such strip
searches; and

(**Subclass 3 – "Suspicionless Strip Search Injunctive Relief
Subclass"**) those persons who will be subjected to unclothed
searches until the date on which Multnomah County and Sheriff
Dan Staton are enjoined from, or otherwise cease, enforcing their
unconstitutional policy, practice and custom of conducting such
strip searches.

Plaintiff's Supplemental Proposed Class Definition (docket #37), p. 2.

The first two Subclasses seek damages for strip searches before (Subclass 1) and after
(Subclass 2) the installation of the privacy panels.  Subclass 3 seeks only injunctive relief.

Defendants contend that Cunningham has no standing to represent a class seeking
injunctive relief (Subclass 3) and contest each element of Cunningham's proof to certify a class
under both FRCP 23(a) and (b).  For the reasons set forth below, this court finds that certification
of the class and Subclasses 1 and 2 is appropriate, as is conditional certification of Subclass 3.

## I. <u>FRCP 23(a) and (b) Standards</u>

A plaintiff seeking to represent a class must satisfy the threshold requirements of
FRCP 23(a) and fall within at least one of the categories identified in FRCP 23(b).  The
plaintiff bears the burden of demonstrating that each element of FRCP 23 is satisfied.  *See Gen.
Tel. Co. of the Sw. v. Falcon*, 457 US 147, 158-61 (1982); *Hanon v. Dataproducts Corp.*, 976
F2d 497, 508 (9th Cir 1992).  While the primary focus is not on the merits of the plaintiff's
claims, courts "must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a)

---

"booths" in the boot room and that, following installation of those booths, inmates who participated in kitchen duty
were subjected to strip searches in individual booths.  Mathews Decl., ¶ 11.  If defendants are correct, then the end
date for Subclass 1 will need to be amended accordingly.

have been satisfied.'" *Ellis v. Costco Wholesale Corp.*, 657 F3d 970, 980 (9th Cir 2011), quoting

*Wal-Mart Stores, Inc. v. Dukes*, 131 S Ct 2541, 2551 (2011).  As the Supreme Court has stressed,

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must

affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove

that there are in fact sufficiently numerous parties, common questions of law or fact, *etc*."  *Wal-*

*Mart*, 131 S Ct at 2551.  In addition, the court's "rigorous analysis" under FRCP 23 frequently

"will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be

helped."  *Id*.

      To determine whether class certification is proper, the court may consider material

beyond the pleadings and require supplemental evidentiary submissions by the parties.  *Blackie*

*v. Barrack*, 524 F2d 891, 901 n17 (9th Cir 1975).

## II.  <u>Standing</u>

      Defendants first contend that Cunningham has no standing to represent Subclass 3, the

"Injunctive Relief Subclass."  Subclass 3 covers those inmates who are subjected to unclothed

and suspicionless searches, without regard to whether those searches are conducted in a "group"

setting or in the privacy booths installed in the MCIJ boot room as of September 16, 2011.

      Article III standing requires an injury-in-fact that is fairly traceable to the defendants'

challenged actions which is likely to be redressed by a favorable decision.  *Arreola v. Godinez*,

546 F3d 788, 795 (7th Cir 2008), citing *Lujan v. Defenders of Wildlife*, 504 US 555, 560-61

(1992).  However, courts are cautioned to keep the standing inquiry separate from the issue of

whether plaintiff is entitled to any relief and not to conflate it with the Rule 23 inquiry about the

suitability of the plaintiff to serve as the class representative:

> Although the two concepts unfortunately are blurred at times,
> standing and entitlement to relief are not the same thing. . . .

> When deciding questions of standing, courts must look at the case
> as a whole, rather than picking apart its various components to
> separate the claims for which the plaintiff will be entitled to relief
> from those for which he will not.  If the court becomes too
> enmeshed in the plaintiff's entitlement to relief, it will stray
> beyond the standing inquiry into the merits.
>
>           *      *      *
>
> [T]he law does not preclude a plaintiff from filing suit simply
> because some forms of relief may be unavailable, or indeed
> because in the end [a plaintiff] cannot prove that he is entitled to
> any relief. . . .  [T]he inherent problem with the idea of "standing to
> bring a class action" is that it "conflat[es] the standing inquiry with
> the inquiry under Rule 23 about the suitability of a plaintiff to
> serve as a class representative."

*Id* at 794-95 (brackets and citations omitted).

Cunningham is no longer in Multnomah County custody or under any supervision by

Multnomah County.  He acknowledges that the only way he would return to MCIJ is to commit a

new crime in Multnomah County which he has no intention of doing.  Cunningham Depo., p. 19.

Also, Cunningham was subjected only to group strip searches, not the individualized strip

searches conducted after the installation of privacy panels in the boot room.  Subclass 3 targets

defendants' ongoing policy of conducting suspicionless post-kitchen duty strip searches in the

privacy stalls now installed in the MCIJ boot room, not the group searches experienced by

Cunningham which have ended.

Nevertheless, the record reflects that Cunningham is a member of the proposed class.  His

alleged injury of being subjected to suspicionless strip searches is fairly traceable to defendants'

conduct and policies.  Even if he is not entitled to relief as a member of Subclass 3, as discussed

below, that issue is separate and apart from his standing.  As in *Arreola*, this court concludes that

Cunningham has standing to pursue this lawsuit, and "[w]hether he is entitled to relief on any or

all of [the asserted] claims and whether he may serve as an adequate class representative for

others asserting such claims are separate questions . . . ."  *Id*.

9 – FINDINGS AND RECOMMENDATION

## III.    Class Certification

### A.    Legal Standards

To represent a class, Cunningham must satisfy the threshold requirements of FRCP 23(a),

as well as the requirements under one of the subsections of FRCP 23(b).

A case is appropriate for certification as a class action pursuant to FRCP 23(a) only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact are common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Cunningham seeks class certification for each type of class action set forth in

FRCP 23(b).  Under FRCP 23(b)(1), a class action may be maintained if prosecuting separate

actions by or against individual class members would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

FRCP 23(b)(2) requires that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole."

Finally, class certification under FRCP 23(b)(3) is appropriate if the court finds that

"questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available methods of fairly

and efficiently adjudicating the controversy," considering:

10 – FINDINGS AND RECOMMENDATION

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

B.    **FRCP 23(a)**

1.    **Numerosity**

Numerosity is satisfied if "the class is so large that joinder of all members is impracticable."  FRCP 23(a)(1).

Cunningham challenges strip searches over a two-year period.  During that time, every kitchen worker on two daily shifts at MCIJ was subjected to a search at the conclusion of kitchen duty.  According to Cunningham, 20 inmates worked on kitchen duty per shift.  Farrar Decl., ¶ 6 & Ex. 4 (Matthews Depo.), p. 26[8].  Without overlap, this calculates to nearly 15,000 individual searches.  Some overlap likely exists, given that some inmates serve on kitchen duty for multiple days, as did Cunningham.  Even assuming that only 10% of the total number of possible searches were conducted on separate inmates, there would be nearly 1,500 inmates who were subjected to such searches, which is about the number of names on the list supplied by Cunningham and which defendants acknowledge is a list of individual inmates that jail records identify as having worked kitchen duty.  *Id*, Ex. 7.

The list does appear to contain some duplications because it lists inmates with the same SWISID number multiple times under different "booking numbers" (*id*, p. 1, listing inmate Robert Lyday under booking numbers 1167064, 1170500, and 1197162) or lists the same inmate

---

[8] Although this page is missing from the court's record, defendants do not object to this citation.

multiple times with no apparent distinction between the listings (*id*, listing inmate "Turner, Mark Amerine" three times under the same booking numbers), or a combination of these duplications (*id*, p. 9, listing inmate Shawn Perry Bice a total of five times under three different booking numbers).  However, again assuming that only 10% of the list provided consists of unique inmate names (which appears to be considerably below the actual percentage of the list that is comprised of unique names), nearly 150 individual inmates would be potential class members. That number, which appears to be considerably lower than the number of potential class members in this case, is sufficient to satisfy the numerosity requirement.  *See Immigrant Assistance Project of Los Angeles Cnty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F3d 842, 869 (9th Cir 2002) (citing case finding that classes of 39, 64, and 71 satisfied numerosity criterion). Accordingly, this court concludes that the numerosity requirement is met.

### 2.    Commonality

FRCP 23(a)(2) requires the existence of "questions of law or fact common to the class," and FRCP 23(a)(3) further requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

> The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Falcon*, 457 US at 157 n13.

The commonality standard is not strictly construed, but "has been construed permissively.  All questions of fact and law need not be common to satisfy the rule.  The

existence of shared legal issues with divergent factual predicates is sufficient, as is a common

core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler*

*Corp.*, 150 F3d 1011, 1019 (9th Cir 1998). The Supreme Court has recently clarified the

commonality requirement, at least in employment discrimination cases, by requiring "the

plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 131

S Ct at 2551 (quotation omitted). "This does not mean merely that they have all suffered a

violation of the same provision of law," but instead that their claims "depend upon a common

contention . . . of such a nature that it is capable of classwide resolution — which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." *Id*. Although "[e]ven a single [common] question will do," *id* at

2556 (internal citation and quotation marks omitted), "[w]hat matters to class certification is not

the raising of common 'questions'—even in droves—but, rather the capacity of a classwide

proceeding to generate common answers apt to drive the resolution of the litigation." *Id* at 2551

(emphasis omitted).

Defendants argue that commonality is not present because the claims of each plaintiff

will require an individual inquiry into the reasonableness of the search. This court concludes that

this line of argument is an impermissible merits-based attack, which misses the point that the

claims at issue in this case are directed at MCIJ policies that were or are being applied across-

the-board to inmates coming off kitchen duty.

Cunningham identifies several factual and legal issues which he contends are common to

the proposed subclasses. First, he challenges MCIJ policies and practices which have allegedly

damaged all class members by subjecting them to unconstitutional searches. In particular, he

contends that there are no individual fact questions on the issue of liability because defendants

have admitted that no individual determinations of reasonable suspicion to conduct the searches were made.  Instead, as a matter of standard policy and procedure, all class members underwent suspicionless strip searches at the conclusion of every kitchen duty shift.

Cunningham also asserts that until the privacy panels were installed in September 2011 and the official policy concerning strip searches was changed in November 2011, all class members were subjected to group strip searches in the MCIJ boot room in plain view of other inmates and staff who were not involved in the strip searches.  In short, Cunningham contends that the same course of conduct allegedly injured each class member, satisfying the commonality requirement.  *See Fonder v. Sheriff of Kankakee Cnty.*, No. 12-CV-2115, 2013 WL 5644754, at *6 (CD Ill Oct. 15, 2013) (persons arrested without a warrant who share the experience of being strip searched prior to a determination of probable cause satisfied commonality requirement due to "standardized conduct towards members of the proposed class"); *see also Young v. Cnty. of Cook*, No. 06 C 552, 2007 WL 1238920, at *5 (ND Ill April 25, 2007) ("Courts have consistently held that class actions challenging blanket strip search policies satisfy Rule 23(a)(2)'s commonality requirement.") (citations omitted).

The main class consists of MCIJ inmates "subjected to unclothed searches at the conclusion of kitchen duty shift in the "boot room."  Subclass 1 are those persons "subjected to group unclothed searches" between specific dates, corresponding to the time period before privacy panels were installed in the boot room and the issuance of Special Order 11-44. Subclass 2 includes those persons subjected to unclothed searches at any time between the beginning of the class period and the date suspicionless searches cease, including searches after installation of the privacy panels, while Subclass 3 seeks injunctive relief to put a halt to all suspicionless searches, including those encompassed by Subclass 2.  The common element is

being subjected to suspicionless searches following a stint on kitchen duty pursuant to MCIJ

Special Order 01-21.  Subclass 1 shares a further common element, namely being searched in a

group in view of other inmates, while Subclasses 2 and 3 share the common element of

suspicionless searches, albeit not in a group setting, but instead in the individual privacy booths.

     Defendants raise a number of other issues which they contend destroy commonality.

However, those issues appear more appropriate to address under the typicality and adequacy of

representation prongs, to which this court now turns.

### 3.    <u>Typicality</u>

     Typicality is similar to the commonality requirement.  "Under the rule's permissive

standards, representative claims are 'typical' if they are reasonably co-extensive with those of

absent class members; they need not be substantially identical."  *Hanlon*, 150 F3d at 1020.

Because the alleged cause of the proposed class members' injury is an allegedly unconstitutional

policy and practice, the "typicality inquiry involves comparing the injury asserted in the claims

raised by the named plaintiffs with those of the rest of the class."  *Armstrong v. Davis*, 275 F3d

849, 869 (9th Cir 2001).  Although the claims of the class representative need not be identical to

the claims of other class members, the class representative "must be part of the class and possess

the same interest and suffer the same injury as the class members."  *Falcon*, 457 US at 156

(internal quotation marks and citation omitted).

     Defendants contend Cunningham's claims are not typical of those of the rest of the class

because Cunningham:  (1) "volunteered" to work on kitchen duty knowing the existence of the

strip search policy and thereby "consented" to the search; (2) was not searched after the

installation of the panels; and (3) was not in custody as of the date this lawsuit was filed, putting

him on different footing under the Prison Litigation Reform Act ("PLRA") from other potential

class members.  None of these issues render Cunningham's claims atypical of the class.

15 – FINDINGS AND RECOMMENDATION

Defendants first argue that as an "unsentenced" inmate, Cunningham was not required to work, but volunteered to accept a work assignment in the MCIJ kitchen, and continued to work there despite being subjected to strip searches after each shift. Adgers Supp. Decl., ¶ 6 & Ex. 2. In contrast, a "sentenced" inmate is required to work. Mathews Decl., ¶ 2. Cunningham believes that the distinction between an "unsentenced" and "sentenced" inmate is a distinction without a difference because the booking status in Multnomah County's computer system does not differentiate between local and state sentences, and the deputies are not trained to check a worker's Hire/Fire card against their status in the computer once they are hired as a worker. Griffin Supp. Decl., ¶ 6; Adgers Supp. Decl., ¶ 12. Moreover, Cunningham denies that he volunteered to be strip searched and states that had he refused to work in the MCIJ kitchen, he would have been put in disciplinary segregation and received a disciplinary report which would have added 18-22 days to his state sentence. Cunningham Supp. Decl., ¶¶ 3, 6-7.

To justify the lawfulness of the search, defendants have the burden of proving that consent was freely and voluntarily given based on the totality of the circumstances, including knowledge of the right to refuse to give consent. *Schneckloth v. Bustamonte*, 412 US 218, 222, 249 (1973). Consent cannot be established by "showing no more than acquiescence to a claim of lawful authority." *Bumper v. N. Carolina*, 391 US 543, 548-49 (1968). *See also United States v. Ocheltree*, 622 F2d 992, 994 (9th Cir 1980) (consent to search held invalid when individual was implicitly threated with illegal detention if he did not consent). Whether Cunningham consented because he was an "unsentenced" inmate is a merits-based question that should not be resolved at the class certification stage.

And even if Cunningham did consent, he can still argue that, under the circumstances, the strip searches were unconstitutional. *See Blackburn v. Snow*, 771 F2d 556, 568 (1st Cir 1985)

(forcing a prison visitor to choose between undergoing a strip search or leaving did not affect the unconstitutionality of a strip search policy "for it is the *very choice to which she was* put that is constitutionally intolerable"); *Thorne v. Jones*, 765 F2d 1270, 1276 (5th Cir 1985) (strip search that violated the Fourth Amendment cannot be rendered lawful because of consent). Again, this is a merits-based question that does not prevent class certification. Should the court determine on the merits that volunteering to work in the MCIJ kitchen is equivalent to consenting to an illegal strip search, then the court can decertify the class or grant leave to replace Cunningham as the class representative.

As to defendants' second argument that Cunningham was strip searched before installation of the privacy panels, the crux of Cunningham's claim is that defendants improperly subjected all kitchen duty workers to the blanket strip search policy, regardless of an individualized suspicion that the worker may be in possession of contraband. In that regard, his claim is typical of every member of the proposed class as a whole.

Finally, defendants argue that typicality is destroyed because Cunningham seeks to recover compensatory damages for his mental and emotional harm which other class members who are in custody cannot recover. The PLRA bars a civil action "by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 USC § 1997e(e). However, a plaintiff in a § 1983 action need not prove actual harm to recover damages. "If the jury finds a constitutional violation, an award of nominal damages is mandatory, not permissive." *Floyd v. Laws*, 929 F2d 1390, 1402 (9th Cir 1991); *see also Oliver v. Keller*, 289 F3d 623, 630 (9th Cir 2002) (nominal damages not barred by the PLRA). Thus, even if some class members cannot recover damages for mental or emotional injury under the PLRA,

they are still entitled to recover a nominal $1.00 damage award as a symbolic vindication of their constitutional right.

### 4.    Adequate Representation

The final FRCP 23(a) prerequisite, adequacy of representation, is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  The satisfaction of constitutional due process requires that absent class members be afforded adequate representation prior to an entry of judgment that binds them.  *Hanlon*, 150 F3d at 1020 (citation omitted).  Determining the adequacy of representation requires consideration of two questions:  "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Id* (citation omitted).  The adequacy of representation is satisfied as long as one of the plaintiffs is an adequate class representative.  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F3d 1152, 1162 (9th Cir 2001).

Defendants contend that even if  Cunningham has standing, he is an inadequate representative for Subclass 3 seeking injunctive relief because he is no longer incarcerated and does not intend to return to MCIJ.  In support, defendants cite *Arreola*, in which a former inmate brought a class action against a jail for violating the Eighth Amendment for denying crutches to inmates in certain areas.  Although the plaintiff had standing to maintain a claim for damages, the Seventh Circuit concluded that he was not an adequate class representative for prospective injunctive relief because "he was no longer at the Jail.  The likelihood that he will return to the Jail *and* will once again be suffering from a lower-extremity fracture requiring crutches is too speculative to support a right to an injunction on his part."  *Arreola*, 546 F3d at 799.  The plaintiff argued that he was an adequate class representative since the Jail served only as a temporary

housing facility, the need for crutches is often transitory, and the PLRA requires prisoners to exhaust administrative remedies before filing suit.  The court was not convinced that he was "a good candidate for application of the 'capable of repetition, yet evading review' concept" because "some people need crutches for a much longer period of time than Arreola apparently did, and we cannot conclude that it would be impossible for a more suitable representative of a Rule 23(b)(2) class to emerge." *Id* (citation omitted).  Similarly, defendants argue that the likelihood that Cunningham will return to MCIJ and once again work in the kitchen is too speculative for injunctive relief.

Cunningham argues that *Arreola* is distinguishable because it is far less likely that a former inmate will return to jail and require crutches than for him to return to MCIJ and be subjected to a suspicionless strip search after working in the kitchen.  However, Cunningham filed this lawsuit well after his detention at MCIJ ended, and he did not seek class certification while he was still subject to the strip searches at issue.  Thus, his claim for injunctive relief did not become moot because of the inherently transitory nature of that claim.  *See United States Parole Comm'n v. Geraghty*, 445 US 388, 399 (1980) (allowing the appeal of a denial of a class certification motion although the named plaintiff's claim had expired and would not reoccur).  Rather, at no time would Cunningham have been entitled to injunctive relief.

Nevertheless, this is the only deficiency in his request for class certification.  Rather than denying his motion for class certification as to Subclass 3, Cunningham proposes that this court should certify Subclass 3 conditionally and propose an additional class representative by a date certain.  The court should accept that proposal and allow him an opportunity to recruit a plaintiff who could serve as an adequate class representative for Subclass 3.

///

19 – FINDINGS AND RECOMMENDATION

### C.  **FRCP 23(b)(2)**

FRCP 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Only Subclass 3 falls within this subsection.  Even though MCIJ has changed its policy, it still imposes suspicionless strip searches on all inmates coming off kitchen duty which Cunningham seeks to enjoin.  Although Cunningham is not an adequate representative, as discussed above, Subclass 3 otherwise fits well within this type of class.

### D.  **FRCP 23(b)(3)**

The predominance of common questions of law or fact required by FRCP 23(b)(3) is "more stringent" and "far more demanding then" the commonality requirement of FRCP 23(a).  *Amchem Prods. Inc. v. Windsor*, 521 US 591, 623-24 (1997).  However, it is met in this case.  All class members are allegedly affected in the identical way by being subjected to the same suspicionless strip search policy, the identical type of search (unclothed, visual), in the same setting (boot room with or without privacy panels), and a defined period of time (from two years prior to September 23, 2010, through the date when the "group" searches were stopped, either due to installation of the privacy panels and directive from MCIJ supervisors and/or through enactment of the updated policy requiring privacy panels).  In addition, this class is sufficiently numerous to make a class action appropriate, but not so numerous as to be unmanageable.  No class member would have a superior claim to controlling the litigation individually due to the similar (if not identical) nature of the alleged harm.

Nonetheless, defendants argue that certification is not appropriate under FRCP 23(b)(3) because the calculation of damages as to extent of harm suffered by each class member and the

issue of consent are highly individualized inquiries.  However, damage variability alone does not

mean that common issues do not predominate.  *See e.g.*, *Hickey v. City of Seattle*, 236 FRD 659,

667 (WD Wash June 9, 2006), citing *Maneely v. City of Newburgh*, 208 FRD 69 (SDNY

May 16, 2002) (certifying class challenging constitutionality of city police department's policy

of strip searching all pre-arraignment prisoners); *Smith v. Montgomery Cnty.*, 573 F Supp 604,

613 (D Md Oct. 26, 1983) (certifying class of persons unlawfully strip searched, explaining

"resolution of the liability and damages issues within the context of a class action is far more

efficient than individual prosecution of damages actions").  Nor does the contested issue of

consent by individual class members preclude certification because of the "common issue at the

core of this case – whether defendants maintained an unconstitutional blanket strip search policy

during the class period."  *Maneely*, 208 FRD at 78 (citations omitted) (addressing the

individualized determination whether defendants had a reasonable suspicion to strip search each

individual plaintiff).

     Therefore, both Subclasses 1 and 2 meet the requirements of FRCP 23(b)(3).

**E.  FRCP 23(b)(1)**

     A class action may be certified under FRCP 23(b)(1) to avoid inconsistent or varying

adjudications of individual claims.  Absent certification of Subclasses 1 and 2, a danger exists

that multiple inmates subjected to the strip searches may file individual actions, resulting in

contrary rulings by different courts.  Moreover, by promulgating its strip search policies,

defendants have acted uniformly with respect to all class members.  Thus, Subclasses 1 and 2 fit

within this subsection as well.

///

///

21 – FINDINGS AND RECOMMENDATION

## IV.  Appointment of Class Counsel

Under FRCP 23(c)(1)(B), an order certifying a class "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)."  Cunningham requests that the court appoint Tonna K. Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman as co-lead class counsel for the class.  Defendants have not objected to this request.

## RECOMMENDATION

For the reasons stated above, Cunningham's Motion for Class Certification (docket #24) should be granted as to Subclasses 1 and 2 and should be conditionally granted as to Subclass 3 with a date set for plaintiff to propose an additional class representative.  In addition, Tonna K. Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman should be appointed as co-lead class counsel for the class.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Monday, September 29, 2014.  If no objections are filed, then the Findings and+ Recommendation will go under advisement on that date.  If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED September 11, 2014.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge