IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**JOSEPH CUNNINGHAM, individually,**
**on behalf of a class of others similarly**
**situated**,

          Plaintiff,

     v.

**MULTNOMAH COUNTY,** and **DAN**
**STANTON, both individually and in his**
**official capacity as Sheriff**,

          Defendants.

No. 3:12-cv-01718-ST

OPINION AND ORDER

**MOSMAN, M.**,

On September 11, 2014, Magistrate Judge Stewart issued her Findings and

Recommendation ("F&R") [40] in the above-captioned case recommending that Plaintiff Joseph

Cunningham's Motion for Class Certification [24] should be granted as to Subclasses 1 and 2,

and should be conditionally granted as to Subclass 3. She also recommended that Tonna K.

Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman

should be appointed as co-lead counsel for the class.

On October 20, 2014, Defendants filed objections to Judge Stewart's F&R [44].

Defendants argued Judge Stewart erred in: (1) certifying subclasses searched after the installation

of privacy panels; and (2) her analysis of several of the requirements of FRCP 23.

1 – OPINION AND ORDER

I adopt in part, and modify in part Judge Stewart's F&R. Mr. Cunningham's motion should be granted as to Subclasses 1 and 2, and should be conditionally granted as to Subclass 3. I adopt Judge Stewart's recommendation that Tonna K. Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman should be appointed as co-lead counsel for the class.

## BACKGROUND

Mr. Cunningham was booked into Multnomah County custody in mid-August 2010 and transferred to the Multnomah County Inverness Jail ("MCIJ") on August 14, 2010. For the duration of his stay at MCIJ between August and October 2010, Mr. Cunningham was classified as an "unsentenced" inmate. The "unsentenced" classification is given to those inmates who are arraigned but pending trial or entering a plea on charges. "Unsentenced" inmates also include those who have been sentenced to confinement in the custody of the Oregon State Department of Correction ("ODOC") but have not yet been transferred to ODOC. "Sentenced" inmates are those who are convicted of a charge and sentenced to incarceration in a county corrections facility. Those inmates who have both sentences of incarceration and pending charges are treated as "sentenced" inmates. "Unsentenced" inmates have the option to participate in prison work programs, but "sentenced" inmates are compelled to participate in prison work programs.

Mr. Cunningham worked as a dorm worker between September 1 and September 10, 2010. His status then changed to a utility worker, and he began working in the MCIJ kitchen on September 12, 2010. Defendants emphasized in their objections that Mr. Cunningham was moved to kitchen duty at his own request, and therefore was not compelled by jail personnel to do so. He worked there until October 3, 2010.

On October 15, 2001, nearly nine years before Mr. Cunningham's arrival at MCIJ, the Eastside Facilities Commander issued MCIJ Special Order 01-21 stating that "Kitchen Work

Crews, garbage/linen Work Crews, and any other crew assigned to work outside of the Facility, shall be strip searched before returning to their Housing Unit." Mr. Cunningham alleges that during his incarceration at MCIJ, starting no later than September 23, 2010, and continuing until October 3, 2010, he worked five days a week from 4:30 a.m. until 12:00 p.m. in the MCIJ kitchen. During that time, deputies strip searched him and others in a group and public setting at the close of each shift. These searches took place in the MCIJ "boot room" in view of other inmates and monitored by an operational closed circuit camera with numerous deputies in attendance. The search included removal of all clothing, including underwear. Deputies visually inspected each naked inmate, then instructed each inmate to bend over and spread his buttocks, and lift and separate the penis and testicles for visual inspection; female inmates were instructed to raise their breasts. Three shifts of ten workers each worked daily, including ten women who did clean up in the afternoons, for a total of thirty strip searches daily.

Mr. Cunningham worked in the MCIJ kitchen about twenty times, and was strip searched in a group each time he finished his shift. Inmates were not touched during these searches and the entirety of the search took fewer than five minutes. Mr. Cunningham acknowledges that he suffered no physical injury as a result of these strip searches.

On November 16, 2010, while in custody, Mr. Cunningham served a Notice of Tort Claim on Multnomah County, listing a "Date of Loss" of September 11 through October 3, 2010, and describing the circumstances as follows:

> While working as a kitchen worker at [MCIJ], I . . . was subjected to group strip searches in plain view of other inmates. As I was an unsentenced inmate, the Multnomah County Sheriffs Department clearly violated my 8th Amendment rights because they failed to comply with the American Bar Associations standards for Criminal Justice, Specifically Standard 23-6.10(f).

Sometime in 2011, MCIJ command staff ordered installation of privacy panels in the MCIJ boot room for use during strip searches. The panels created a series of booths which

3 – OPINION AND ORDER

allowed deputies outside of the booths to see the inmates standing in each booth, but did not

allow an inmate in a booth to see any other inmates being strip searched. The panels were in

place by September 16, 2011. About two months later, on November 8, 2011, just over a year

after Mr. Cunningham was released from MCIJ and filed his tort claim notice, MCIJ Facility

Commander Captain Linda Yankee issued Special Order 11-44 concerning Routine Strip

Searches at MCIJ which stated that:

> This Special Order complies with Corrections Division Special Order 03-25,
> CD07.109.000 and is in conjunction with MCIJ Special Orders 01-21, 07-09 and 11-01.
>
> I. For the purpose of strip searches, privacy stalls have been put in place in Processing
> and in the kitchen dress-in room.
>
> II. Whenever conducting a strip search, Corrections Staff shall use the stalls to ensure
> privacy for the inmate.
>
> III. Corrections Staff shall ensure that when an inmate is unclothed they are not in a
> position to be viewed by other inmates.
>
> IV. Corrections Staff shall ensure that hand sanitizer is available to inmates before they
> undress.

Although this order was not issued until November, Defendants argue the privacy panels had

been in use since their installation date of September 16, 2011. They argue this order was merely

the formal adoption of an informal process that was already in place.

The Complaint alleges Defendants' blanket strip search policy pertaining to inmates who

are coming off kitchen duty violates inmates' Fourth and Eighth Amendment rights, and seeks:

(1) compensatory damages for each class member; (2) punitive damages of $1 million against

Sheriff Staton; (3) a declaratory judgment that the strip search policy and practice is

unconstitutional and improper; and (4) an injunction enjoining defendants from continuing to

strip and visual cavity search kitchen workers absent particularized, reasonable suspicion that the

inmate subject to the search is concealing weapons or other contraband.

Mr. Cunningham seeks class certification under Rule 23. The following are the three subclasses that he seeks to have certified:

> **Subclass 1 ("No Privacy Panel Group Strip Search Damages Subclass"):** Those persons subject to group strip searches between September 23, 2010 and November 8, 2011.

> **Subclass 2 ("Suspicionless Strip Search Damages Subclass"):** Those persons subjected to suspicionless strip searches between September 23, 2010 and until the date on which Multnomah County and Sheriff Stanton cease conducting suspicionless strip searches.

> **Subclass 3 ("Suspicionless Strip Search Injunctive Relief Subclass"):** Those persons who will be subjected to strip searches in the future until Multnomah County is enjoined from, or otherwise cease, conducting suspicionless strip searches.

## LEGAL STANDARD

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a de novo determination regarding those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, de novo or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F&R to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F&R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F&R. 28 U.S.C. § 636(b)(1)(C).

A plaintiff seeking to represent a class must satisfy all of the threshold requirements of FRCP 23(a) and fall within at least one of the categories identified in FRCP 23(b). The plaintiff bears the burden of demonstrating that each element of FRCP 23 is satisfied. *See Gen. Tel. Co. of*

*the Sw. v. Falcon*, 457 U.S. 147, 158–61 (1982); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir 1992). While the primary focus is not on the merits of the plaintiff's claims, courts "must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)). As the Supreme Court has stressed, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S.Ct. at 2551. In addition, the court's "rigorous analysis" under FRCP 23 frequently "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* To determine whether class certification is proper, the court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975).

## DISCUSSION

### I.    <u>Appointment of Counsel</u>

Neither party filed objections to Judge Stewart's recommendation that Tonna K. Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman should be appointed as co-lead counsel for the class. I therefore adopt this portion of the F&R as my own. Tonna K. Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman are appointed as co-lead counsel for the class.

### II.    <u>Cutoff Date for Subclass 1</u>

Defendants object to Judge Stewart's decision to use November 8, 2011—the date the MCIJ strip search policy officially changed to incorporate the use of privacy panels—as the

proper cutoff date for Subclass 1. Defendants argue the proper cutoff date is September 16, 2011—the date that the MCIJ strip search policy informally changed and all strip searches were performed with privacy panels. In footnote 7, Judge Stewart agreed that if Defendants could show the policy had informally changed on September 16, 2011, then the date for Subclass 1 should be amended. F&R [40] at 6–7. Defendants have offered uncontroverted evidence from Sergeant Jonathan Mathews that the policy was informally changed on September 16, 2011. Decl. of Sergeant Jonathan Mathews [30] at ¶12. Therefore I find it appropriate to modify the cutoff date for Subclass 1 to September 16, 2011

**III.** _**Florence v. Board of Chosen Freeholders of the County of Burlington**_

Defendants argue _Florence v. Board of Chosen Freeholders of the County of Burlington_ forecloses all generalized Fourth Amendment challenges to suspicionless strip searches of individuals moving into a general jail population. 132 S.Ct. 1510 (2012); Defs.' Objections [44] at 9. I disagree with Defendants' interpretation of _Florence_. Defendants' interpretation of _Florence_ expands its holding to cover situations not considered by the Court. _Florence_ dealt with the constitutionality of general policies of strip searching all new inmates being admitted to the general prison population for the first time. _See Florence_, 132 S.Ct. at 1513 ("Correctional officials have a legitimate interest . . . to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies. . . . This case presents the question of what rules, or limitations, the Constitution imposes on searches of arrested persons who are to be held in jail while their cases are being processed.") _Florence_ did not deal with the constitutionality of general policies of strip searching already incarcerated individuals.

After _Florence_, it is an open question what limits the Constitution places on correctional officials' ability to enact general policies of strip searching inmates who have _already_ been

integrated into the general prison population. *Florence* held that "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Florence*, 132 S.Ct. at 1518 (internal citation omitted). The Court found that general policies of strip searching new inmates were justified by correctional officials interests in screening out: (1) new contagious infections and other medical conditions; (2) gang violence by being able to visually inspect for signs of gang affiliation; and (3) weapons, drugs, alcohol, and other prohibited items readily available to new detainees while in the outside world prior to arrest. *Id.* at 1518–19. Defendants at no point in the briefing try to justify the MCIJ strip search policy as serving either of the first two justifications of *Florence*. It is an open question whether a general policy of strip searching that serves only the third security interest is an exaggerated response to a legitimate security interest.

In addition, once introduced into the prison population, inmates have less access to the types of contraband that can result in dangerous situations for other inmates and correctional officials. While it is almost certainly true that while working in the kitchen inmates have access to knives or other kitchen utensils that could be used as dangerous weapons if introduced into the general prison population, this access to contraband is mitigated by the fact that inmates on kitchen duty were supervised during the entire kitchen shift, and that the jail staff would account for all utensils and equipment at the end of each shift. Dep. of Joseph Cunningham [25-3] at 52:13–21, 60:21–24, 61:5–10. The ability of inmates on kitchen duty to remove contraband from the kitchen is much more restricted than the ability of new inmates to obtain and attempt to sneak in contraband to the general prison population. Given these distinctions, it is plausible that the bar to generalized challenges announced in *Florence* does not apply to this case. Whether or not the *Florence* bar does apply to Mr. Cunningham's claim is something that will be taken up at the

summary judgment stage. But for purposes of class certification, I agree with Mr. Cunningham that *Florence* does not act as an automatic bar to the general challenges to the MCIJ strip search policy brought by Subclasses 2 and 3, and therefore *Florence* does not bar certification of Subclasses 2 and 3.

## IV.    <u>FRCP 23 Requirements</u>

As the party seeking class certification, Mr. Cunningham must show that he has met each of the requirements of FRCP 23(a), and at least one of the requirements of FRCP 23(b). *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Defendants argue Judge Stewart incorrectly determined that each subclass meets these requirements.

### A.    *FRCP 23(a) Threshold Requirements*

FRCP 23(a) states that one or more members of class may sue as representative members on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative are typical of the claims of the class; and (4) the representative party will fairly and adequately protect the interests of the class. Defendants object to Judge Stewart's determination that Mr. Cunningham meets requirements (2)–(4).

#### 1.    FRCP 23(a)(2): Mr. Cunningham is Not a Proper Representative for Subclass 2 because He was Never Searched After the Installation of Privacy Panels

Defendants argue Subclass 2 fails to meet the commonality requirement of FRCP 23(a)(2). Defendants contend that individuals in this subclass were searched in two different manners. The members of Subclass 2 who were exclusively strip searched between September 23, 2010 and September 16, 2011, were strip searched in a group setting. The members of Subclass 2 who were exclusively strip searched between September 16, 2011 and the present,

were strip searched with privacy panels. Defendants argue that this distinction in the manner that different subclass members were searched destroys the commonality between class members' claims.

Subclass 2's claim, however, does not require that all class members were searched in exactly the same way. Mr. Cunningham has described Subclass 2's claim as, "Whether Defendants' blanket strip search policy and practice (that all workers be strip searched at the conclusion of working in the kitchen regardless of probable cause) is Constitutional." Pl.'s Resp. [47] at 19. The key common element is that the inmates were suspicionlessly strip searched, not the presence or absence of privacy panels. At this stage of the litigation, Mr. Cunningham's Subclass 2 claim meets the commonality requirement of FRCP 23 because it is based on the fact that the class members were suspicionlessly searched. Because Defendants have failed to raise a valid objection to Judge Stewart's determination that Mr. Cunningham satisfied FRCP 23(a)(2), I adopt this portion of the F&R.

## 2.    FRCP 23(a)(3): Mr. Cunningham's Claim is Not Typical of Other Members in Subclasses 1 and 2

A named plaintiff does not satisfy FRCP 23(a)(3) if he stands on different factual or legal ground than other class members. In other words, the claims plaintiff will make and the defenses he will face must be typical to members of the class. Defendants argue Mr. Cunningham's claim is not typical of the other members in Subclasses 1 and 2 because: (1) he will face a consent defense and (2) he was searched under factually distinct circumstances from the members of Subclass 2.

### a)   Mr. Cunningham was Not Searched After the Installation of Privacy Panels

Defendants repeat the same arguments they made for the commonality question above. For the same reasons discussed above, the factual distinctions between group searches and privacy panel searches do not make Mr. Cunningham atypical from the class he seeks to represent.

### b)   Mr. Cunningham's Consent Issue Does Not Render Him Atypical

Defendants argue Mr. Cunningham's claim is not typical of many of the members of Subclasses 1 and 2 because there is a significant consent issue involved in his claim that will not be common to all of the members of the two subclasses. Defendants point out that Mr. Cunningham, as an unsentenced inmate, was free to decline work duty, was free to request a different work assignment, and when he requested kitchen duty, knew that he would be subject to a strip search upon the conclusion of each shift. Defendants argue that these facts amount to a free and voluntary consent to the various strip searches. Unlike in a criminal case, as part of his claim in a civil case, Mr. Cunningham carries the burden of proof to show lack of consent to the search. *See Pavao v. Pagay*, 307 F.3d 915, 919 (9th Cir. 2002). Not all members of Subclasses 1 and 2 were unsentenced inmates like Mr. Cunningham who could have requested a different work assignment or who could have decline work duty altogether. Defendants argue that because Mr. Cunningham will have a difficult time establishing lack of consent as an element of his claim, and because not all of the members of Subclasses 1 and 2 will have trouble establishing that element, his claim is atypical to the classes he seeks to represent.

Defendants are correct that Mr. Cunningham will have to overcome a consent defense that will not apply to all members of the various subclasses. In addition, Mr. Cunningham and

each of the class members will at some point have to prove their individual damages caused by the suspicionless strip search policy. Although these two individual issues appear to make Mr. Cunningham's claim atypical to many class members, the proper solution is not to deny class certification, but rather to certify an issue class. FRCP 23(c)(4) states that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The heart of this action is whether or not the MCIJ strip search procedure is constitutional, not whether or not a particular inmate consented to the search procedure. By certifying an issue class over everything but consent and damages, this action will still be able to take full advantages of the efficiencies class actions are designed to promote while avoiding the elements of Mr. Cunningham's claim that make him atypical from the other subclass members. I therefore order that the subclasses in this case be certified as issue classes covering everything but the individual issues of consent and damages. As a result of the issue classes, Mr. Cunningham satisfies FRCP 23(a)(3).

### 3.    FRCP 23(a)(4): Mr. Cunningham is Not an Adequate Representative for the Members of Subclasses 1 and 2

Defendants argue Mr. Cunningham is not an adequate representative for Subclasses 1 and 2 based on the same factual distinctions as the commonality and typicality arguments. For the reasons discussed above, I reject Defendants' objection, and adopt Judge Stewart's determination that Mr. Cunningham satisfies FRCP 23(a)(4).

### B.    *Certifying Money Damages Classes Under FRCP 23(b)(1)*

Defendants argue, and Mr. Cunningham agrees, that the F&R was incorrect to find that Subclasses 1 and 2 can be certified as money damages classes under FRCP 23(b)(1). The Ninth Circuit has stated that "[c]ertification under Rule 23(b)(1)(A) is [] not appropriate in an action

for damages." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001). I therefore modify the F&R to certify only Subclass 3 under FRCP 23(b)(1).

### C.   *Certifying Money Damages Classes Under FRCP 23(b)(3)*

FRCP 23(b)(3) states that class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Defendants argue Judge Stewart failed to properly analyze the key requirements of predominance and superiority.

#### 1.   Common Issues Predominate

Defendants argue individual issues predominate for two reasons: (1) Subclasses 2 and 3 have no predominate issues of fact in common with Subclass 1 given the change in the search procedure (i.e. installation of privacy panels); and (2) individual issues of consent and damages predominate over the common suspicionless strip search policy question for Subclasses 1 and 2.

##### a)   Subclasses 2 and 3 have No Predominant Common Issue with Subclass 1

Given my earlier analysis above regarding Mr. Cunningham's general claim against the suspicionless strip search policy, the factual differences between the various subclasses are not controlling at this stage. Therefore, I agree with Mr. Cunningham that common issues predominate.

##### b)   Individual Issues of Consent and Damages Predominate

As discussed above, the use of issue classes resolves the problems raised by the individual issues of consent and damages. Having removed these issues from the class, common issues predominate.

**2.    Class Treatment is the Superior Method of Adjudication**

In their briefing, Defendants make several arguments about how the individual concerns of consent and damages make a class unmanageable, and therefore argue that certifying a class would be an inferior manner for adjudicating the class members' claims. All of these arguments are handled by the use of an issue class.

At oral argument, however, Defendants raised a valid argument against the potential superiority of an issue class. Defendants argued that if the consent and damages issues are carved out of the immediate action, requiring class members to bring individual claims at a later date to show a lack of consent and to prove damages, then nothing has been done to cut down on the ultimate number of actions this court will have to hear to fully resolve each class member's claims. Defendants' argument, however, only deals with half the story. If Mr. Cunningham wins on the merits, then Defendants are correct that this court will have to hold separate trials for every class member in order to determine the issues of consent and damages. If, however, Mr. Cunningham loses on the merits, the court will have disposed of every class member's claim in a single action.  Given the potential an issue class provides to resolve all the individual actions in the event of an adverse judgment for Mr. Cunningham, a class action is a superior way of dealing with the issues in this case.

One criticism of the reasoning above is that it proves too much. It would appear to validate every issue class in every instance. There are three additional plus factors present in this case that justify the reasoning above. First, in the event Mr. Cunningham receives a favorable decision regarding the issues covered by the class, there is nothing in the record that suggests there would be an overwhelming number of individual actions left to adjudicate. The current best estimate of the number of class members is 150. F&R [40] at 12. This is not an unmanageable

number. Second, in the event Mr. Cunningham receives a favorable decision regarding the issues covered by the class, resolution of these issues will significantly advance every class member's action. The issues covered by the class constitute the heart of this action, not one or two peripheral issues. Finally, in the event Mr. Cunningham receives an adverse decision regarding the issues covered by the class, the adverse decision will be outcome determinative of every class member's action. Again, the issue class covers the issues central to the case, not one or two peripheral issues that will have little bearing on the ultimate outcome of the case.

## CONCLUSION

For the foregoing reasons, I ADOPT in part and MODIFY in part Judge Stewart's F&R [40]. Tonna K. Farrar and the law firm of Bonnett, Fairbourn, Friedman & Baling, P.C., and Leonard Berman are appointed as co-lead counsel for the class. I certify Subclasses 1 and 2 under FRCP 23(a) and FRCP 23(b)(3). I conditionally certify Subclass 3 under FRCP 23(a) and FRCP(b)(1). According to the conditions in the F&R, Subclasses 1, 2, and 3 are certified as issues classes covering all the issues in Mr. Cunningham's claims other than consent and damages. Finally, I modify the cutoff date for Subclass 1 from November 8, 2011 to September 16, 2011.

IT IS SO ORDERED.

DATED this    20th    day of January, 2015.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge