IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **JOSEPH CUNNINGHAM,** individually, on behalf of a class of others similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>**MULTNOMAH COUNTY** and **DAN STANTON,** individually and in his official capacity as Sheriff,<br><br>            Defendants. | No. 3:12-cv-01718-MO<br><br>OPINION AND ORDER |

**MOSMAN, J.**,

Defendants have filed a Motion for Summary Judgment [68] and Plaintiff has filed a Cross Motion for Partial Summary Judgment [80]. On February 24, 2016, I heard oral argument from the parties on both motions. For the reasons I articulated at oral argument and outline below, I GRANT Defendants' Motion for Summary Judgment [68] and DENY Plaintiff's Motion for Partial Summary Judgment [80].

## Background

A.  Factual Background

Mr. Cunningham was booked into Multnomah County custody in mid-August 2010 and transferred to Multnomah County Inverness Jail "MCIJ" on August 14, 2010. For the duration of his stay at MCIJ between August and October 2010, Mr. Cunningham was classified as an "unsentenced" inmate. The "unsentenced" classification is given to those inmates who are

1 – OPINION AND ORDER

arraigned but pending trial or entering a plea on charges. "Unsentenced" inmates also include those who have been sentenced to confinement in the custody of the Oregon State Department of Correction ("ODOC") but have not yet been transferred to ODOC. "Sentenced" inmates are those who are convicted of a charge and sentenced to incarceration in a county corrections facility. Those inmates who have both sentences of incarceration and pending charges are treated as sentenced inmates. This distinction ends up being important for issues of consent. Unsentenced inmates do not have to participate in the prison work programs, but sentenced inmates are compelled to participate in the prison work programs. The other major distinction between class members is between pre-trial detainees and convicted inmates.  Pre-trial detainees, a subset of the unsentenced group, may have greater constitutional protections than convicted inmates.

On October 15, 2001, nearly nine years before Mr. Cunningham's arrival at MCIJ, the Eastside Facilities Commander issued MCIJ Special Order 01-21, stating that "Kitchen Work Crews, garbage/linen Work Crews, and any other crew assigned to work outside of the Facility, shall be strip searched before returning to their Housing Unit." While incarcerated, Mr. Cunningham worked the morning shift of the kitchen work assignment five days per week. During that time, deputies strip searched him and others in a group and public setting at the close of each shift. When inmates finish their shift, they are brought from the kitchen area to a sally port to await the escort deputies.  The escort deputies will take a group of inmates from the sally port to a separate room, the "boot room," to be searched and to receive clean clothes, socks, and sandals.  Once the group to be searched enters, the strip search, also called a visual body cavity search, is given.  The escort deputy directs the inmate to remove his clothes and shake them out on the floor while facing the deputy who is several feet away.  The inmate is then directed to

raise his hands, showing the front and back of his hands to the deputy, and to move the identification wristband up and down his wrist to show nothing is concealed behind the band. Next, the inmate bends forward to run his fingers through his hair and then shows the deputy the back of his ears.  The inmate is asked to open his mouth, stick out his tongue, and move it to show his mouth is empty.  The inmate is told to lift his penis and scrotum.  The inmate then turns around, bends down, and spreads his buttocks and coughs once.  Finally, the inmate is asked to show the soles of his feet.  The deputy gives verbal directions throughout the search and accompanies those verbal directions with physical demonstrations of the movements.  Each group of searches takes between thirty seconds and one minute.  The inmates are males and the searches are only conducted by male deputies.

      Sometime in 2011, MCIJ command staff ordered installation of privacy panels in the MCIJ boot room for use during strip searches. The panels create a series of booths which allow deputies outside of the booths to see the inmates standing in each booth, but do not allow an inmate in a booth to see the inmate in the next booth. The panels were fully in place by September 16, 2011. About two months later, on November 8, 2011, a little over a year after Mr. Cunningham was released from MCIJ and filed his tort claim notice, MCIJ Facility Commander Captain Linda Yankee issued an order memorializing the new privacy stall policy. The installation of the booths reduced the size of the group that could be searched from ten inmates to five, necessitating more rounds of searching.  Because of the space limitations with the stalls in place, only one deputy is now present for a search, rather than the two that had previously been there.

      The jail itself, Inverness, is a medium security facility housing seven to nine hundred inmates, most of whom are convicted, but some of whom are pre-trial detainees.  All inmates

3 – OPINION AND ORDER

must be escorted from one area of the jail to another. At any one time, there are five escort deputies who serve this function in addition to providing support for other deputies. Two of these deputies are assigned to escorting and strip searching the kitchen inmates at the conclusion of their shifts. Inverness, like other jails, polices what their inmates may possess in order to prevent violence, the use of drugs, and the making of alcohol. There have been over five hundred documented instances of contraband at Inverness since 2012, including discoveries of homemade alcohol, marijuana, amphetamines, heroin, needles, and lighters. No contraband has been found as a result of the kitchen strip searches, although there has been at least one instance where a civilian worker was suspected of trying to work with a kitchen inmate to bring in drugs.

     Despite this lack of discovered contraband, Defendants outline numerous potential contraband concerns in the kitchen. The kitchen stock includes tools such as knives and can openers. The parties dispute whether all tools are regularly accounted for at the end of each shift. Defendants argue knives are accounted for on a shadow board but other items are "not always thoroughly inventoried." Plaintiff argues all utensils and equipment are accounted for at the end of each shift. Food storage, another potential source of contraband, is also in the kitchen area. An Aramark worker, one of the third-party contractors who run the kitchen facility, always accompanies an inmate while in the storage area. However, an inventory of food storage is not done at the end of the shift. In addition to the storage area, inmates have access to the food in the course of its preparation. Inmates open cans and have access to sharp lids. To protect against the use of the lids, Aramark workers check the trash after each shift. Inmates also work at the loading dock, which at times includes packing material and broken pieces of pallet. The jail claims it does not and cannot constantly monitor the unloading process.

4 – OPINION AND ORDER

Aramark employees and a deputy are present through the shift.  In addition, there are cameras throughout the kitchen, with another deputy monitoring the video screens. Nevertheless, Defendants claim for much of the time inmates are not supervised.  Plaintiff contests this claim, citing to deposition testimony acknowledging that inmates are under constant supervision, as they should be according to policy.

B.  Procedural Background

Mr. Cunningham alleges Defendants' blanket strip search policy pertaining to inmates who are coming off kitchen duty violates inmates' Fourth and Eighth Amendment rights and seeks: (1) compensatory damages for each class member; (2) punitive damages of $1 million against Sheriff Staton; (3) a declaratory judgment that the strip search policy and practice is unconstitutional and improper; and (4) an injunction enjoining defendants from continuing to strip and visual cavity search kitchen workers absent particularized, reasonable suspicion that the inmate subject to the search is concealing weapons or other contraband.

Mr. Cunningham sought class certification under Rule 23. I certified two classes and conditionally certified a third:

> **Subclass 1 ("No Privacy Panel Group Strip Search Damages Subclass"):** Those persons subject to group strip searches between September 23, 2010 and September 16, 2011.
>
> **Subclass 2 ("Suspicionless Strip Search Damages Subclass"):** Those persons subjected to suspicionless strip searches between September 23, 2010 and until the date on which Multnomah County and Sherriff Stanton cease conducting suspicionless strip searches.
>
> **Subclass 3 ("Suspicionless Strip Search Injunctive Relief Subclass"):** Those persons who will be subjected to strip searches in the future until Multnomah County is enjoined from, or otherwise cease, conducting suspicionless strip searches.

I had the classes address all issues raised in Mr. Cunningham's claims other than consent and damages.

5 – OPINION AND ORDER

**Discussion**

I have previously explained at oral argument that Defendants had not violated either the Fourth or Eighth Amendments through their actions. I write now to clarify three issues that were raised and left unresolved at oral argument.

1. Pre-Privacy Panel Searches

The gravest constitutional concern occurs during the pre-privacy panel searches. The challenge to the pre-privacy panel searches is properly analyzed under the standard outlined in *Bell v. Wolfish. Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1135 (9th Cir. 2011) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979). Whether a search is reasonable under the Fourth Amendment requires a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell,* 441 U.S. at 559 (1979). The required factors for courts to consider include: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted." *Id.*; *Byrd,* 629 F.3d at 1141.

    i.    Justification for search

The Ninth Circuit has found strip searches are justified when "a good opportunity for concealment has occurred," including when inmates return from outside work details. *Nunez v. Duncan*, 591 F.3d 1217, 1227–28 (9th Cir. 2010). Here, Defendants justify the search by claiming it is required to keeping out weapons and contraband which prisoners are exposed to as part of their work detail and thus the searches are necessary to maintain security in the prison. The Ninth Circuit's holding in *Nunez*, as well as the deferential approach I am required to take as

to determinations by prison officials, establishes that Defendants have a valid justification for searching prisoners who have come from working in the kitchen.[1]

### ii.     Scope of Intrusion

The scope of the intrusion here is indisputably a "frightening and humiliating" invasion, even when conducted "with all due courtesy." *Giles v. Ackerman,* 746 F.2d 614, 617 (9th Cir. 1984). Its intrusiveness "cannot be overstated." *Way v. Cnty. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) (citations and quotations omitted); *see also Kirkpatrick v. City of Los Angeles,* 803 F.2d 485, 489–90 (9th Cir. 1986) ("[T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched."); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1446 (9th Cir. 1989) ("The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute.").   Strip searches are among the most intrusive search possible.  The scope of intrusion factor supports Plaintiff's position.

### iii.     Manner and Place of Search

The only criticism for the manner and place is that the search was conducted in a public area, with prisoners standing close together and no provisions made to maintain the privacy of inmates.  Contrary to what Plaintiff contends, the Ninth Circuit has found the public nature of a strip search can cut in favor of its reasonableness.  In *Byrd,* the Ninth Circuit concluded that the location of a strip search was reasonable when it was performed in a common room with other inmates present "making it less likely that improper conduct would occur." *Byrd,* 629 F.3d at 1143 (citations omitted) (upholding visual strip search of inmate that took place on the tier just outside the inmate's cell within view of other prisoners).

---

[1] See *infra* at part  2 for a detailed discussion of the requirement of deference to prison officials.

7 – OPINION AND ORDER

The pre-privacy panel strip searches were reasonable in manner and place. The officers were as non-invasive as possible and performed the searches quickly and routinely. The public nature of the searches raises serious concerns, but as the Ninth Circuit has previously considered that a protection for inmates, it is insufficient as a basis for unreasonableness. In considering all of the *Bell* factors, I find that although a strip search is the height of intrusion, the justification for the search, the manner of the search, and the place of the search are reasonable. I therefore deny Plaintiff's motion for summary judgment as to the pre-privacy panel searches.

2. Deference to Prison Officials l

The central tenet in evaluating a prisoner's challenge to a prison's policy is that the court must afford significant deference to prison officials' choices made as part of prison administration. In *Florence*, the Supreme Court's most recent statement on strip searches, the Court reiterated that judges must give substantial deference to prison officials and the burden is on a plaintiff to offer "substantial evidence showing [the prison's] policies are an unnecessary or unjustified response to problems of jail security." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1514, (2012). In *Bell*, the Court reasoned that problems in a correction facility are "not susceptible of easy solutions….[p]rison administrators [] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell* 441 U.S. at 545

This deference is owed even when there are few examples of actual contraband being found. The Ninth Circuit has emphasized that even factual scenarios with low numbers of discovered contraband are insufficient to show that a prison's policy is not unjustified. The Supreme Court has stated "[w]hen the Government's interest lies in deterring highly hazardous

conduct, a low incidence of such conduct, far from impugning the validity of the scheme for implementing this interest, is more logically viewed as a hallmark of success." *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 675 n. 3 (1989).  The Ninth Circuit, in considering the empirics, also looked to *Bell* for guidance, noting "*Bell* did not require officials to demonstrate a lengthy history of multiple incidents of smuggling. Rather, in *Bell,* [prison] officials had determined that, in their professional judgment, strip and visual cavity searches after contact visits were necessary for deterrence as well as detection of contraband." *Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 979 (9th Cir. 2010) (citations omitted).  This is particularly relevant to Mr. Cunningham's case given the low incidence of actual contraband being discovered.  In contrast to *Bell*, which included at least one instance of contraband actually being found, here there is only one instance of "suspicion" of conspiracy with an outside contractor working in the MCIJ kitchen.  Nevertheless, given the strong language in *Florence, Bell,* and *Bull*, the general incidence of contraband in the jail, and the prison officials statement that other means would not be sufficient, Plaintiff has failed to meet his burden of producing "substantial evidence" the prison's policy is unjustified.

      The combination of substantial deference to prison officials and a vanishingly small threshold for empirical evidence of actual contraband raises the question of when, if ever, a plaintiff challenging a prison policy can overcome a motion for summary judgment after the prison has declared there is a risk of contraband.  The prison's response at oral argument was that a plaintiff would need to offer, for example, an affidavit from an expert in prison administration outlining how and why the prison's strip search policy is not necessary to deal with the purported threat of contraband.

But even the opinion of an expert may not be enough. In her *Florence* dissent, Justice Ginsberg noted the large number of recommendations from professional bodies that have asked the Court to forbid suspicionless strip searches. She noted:

> The American Correctional Association (ACA)—an association that informs our view of what is obtainable and what is acceptable in corrections philosophy,—has promulgated a standard that forbids suspicionless strip searches. And it has done so after consultation with the American Jail Association, National Sheriff's Association, National Institute of Corrections of the Department of Justice, and Federal Bureau of Prisons . . . [and] [a] standard desk reference for general information about sound correctional practices advises against suspicionless strip searches.

*Florence* 132 S. Ct. at 1533 (citing Dept. of Justice, National Institute of Corrections, M. Martin & T. Rosazza, Resource Guide for Jail Administrators 4, 113 (2004); Dept. of Justice, National Institute of Corrections, M. Martin & P. Katsampes, Sheriff's Guide to Effective Jail Operations 50 (2007)). While following the recommendations of these groups could theoretically satisfy the necessary "deference to prison officials," the *Florence* majority was unpersuaded and found the opinion of nationwide experts to be insufficient evidence to overcome local prison officials' justification. In any event, Plaintiff in this case offered no such evidence, expert or otherwise, so I must defer to the justification provided by the prison officials

    3. Consent

Initially troubled by the distinction between prisoners who chose to work and those who were forced to work, I asked counsel from both sides to provide briefing on the issue of consent. What I meant by "consent" is the idea that some inmates are forced by the prison to work in the kitchen and as a result of that compelled work, the prison then justifies its strip search. To allow blanket strip searches for instances of prison-created risks of contraband seems to establish a system that could lead to prison abuse. Upon consideration, however, the troubling distinction

between the prisoners who consented to be in the kitchen and those who did not have a choice is better considered under the doctrine of "police created exigency."

The doctrine of police created exigency typically addresses the issue of warrantless searches. Historically, courts had determined when police were the reason that exigent circumstances existed, the police could not proceed without a warrant. *Kentucky v. King*, 563 U.S. 452, 461 (2011). In large part, this was to discourage police from being incentivized to create situations which would then be used to justify what would otherwise be violations of the Fourth Amendment. *Id.* This mirrors my concern in the present case that prison officials have created a situation which they then use as a justification for behavior which would, absent that justification, be a violation of the Fourth Amendment.

The protections for criminal defendants from the doctrine of police created exigencies have been sharply curtailed in recent years. In *Kentucky v. King*, the Supreme Court examined the issue in the context of a warrantless search of an apartment that occurred after the police had performed a knock and announce. *Id.* The knock and announce prompted the defendant to begin destroying evidence of his drug use and that attempted destruction of evidence was used by the prosecution as an exigent circumstance to justify the police entry and search of the apartment. The defendant argued because the police had created the exigent circumstance, it could not be used to justify the warrantless search. In its ruling, the Supreme Court offered an extremely narrow interpretation of when a police created exigency would make a warrantless search unconstitutional. The Court determined where "the police [do] not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." *Id.* at 462. Because

11 – OPINION AND ORDER

the police officer's knock and announce had not been a violation of the Fourth Amendment, the subsequent exigent circumstances justified a warrantless search.

Applying the logic of *King* to this case, the fact that the state created the need for the strip search is not enough to make the search unconstitutional. When the prison compelled the inmates to work in the kitchen, the prison did not violate the Fourth Amendment or the Eighth Amendment.[2] Because there was no Fourth or Eighth Amendment violation when the prisoners' work was compelled, any justification for the search that stems from the compelled work is not improper under the logic of the police exigency doctrine.

## Conclusion

For the reasons I articulated at oral argument and outline above, I GRANT Defendants' Motion for Summary Judgment [68] and DENY Plaintiff's Motion for Partial Summary Judgment [80].

DATED this   18th   day of March, 2016.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
Chief United States District Judge

---

[2] Challenges to compelled work are typically brought under the Eighth Amendment. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) *opinion amended on reh'g,* No. 04-35608, 2006 WL 3437344 (9th Cir. Nov. 30, 2006). If a prisoner were to challenge kitchen work under the Eighth Amendment they would need to show 1) "undue pain" and 2) a culpable state of mind from the prison official. Under that analysis, there is no Eighth Amendment violation in this case. *Id.*